Filed 9/19/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Jaden E., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. KIA E., Defendant and Appellant. | A139117 (San Mateo County Super. Ct. No. JV82349) |

In this dependency appeal, Kia E. (mother) seeks relief from the juvenile court order terminating the discretionary reunification services she was receiving pursuant to subdivision (b)(3) of section 361.2 of the Welfare and Institutions Code.[1] Specifically, mother claims that the services offered to her were unreasonable and therefore termination of those services was improper. There appears to have been some confusion in the juvenile court regarding the appropriate legal standards to apply when a dependant minor has been placed with a noncustodial parent pursuant to section 361.2 and reunification services are offered to the previously custodial parent under that statute. In the published portion of this opinion, we conclude that—when a minor is placed with a

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated. All rule references are to the California Rules of Court.

1

previously noncustodial parent at disposition pursuant to section 361.2—a reasonable services finding need not be made at subsequent hearings monitoring that placement. Nevertheless, seeing no abuse of discretion in the juvenile court's order terminating mother's reunification services, we affirm.

## I. BACKGROUND[2]

In early 2012, the San Mateo County Human Services Agency (Agency) received a series of referrals involving Jaden E. (born May 2004), the minor who is the subject of these proceedings. The information obtained indicated that, during the current school year, then seven-year-old Jaden had been chronically tardy and absent from school and was routinely picked up late by his mother from his after-school program. Moreover, since February 2012, the minor's school behavior was reported to have deteriorated rapidly, including: refusing to go to class; hiding; being continually disruptive; throwing chairs, tables, and stored games in a lunch room; failing to complete class assignments; grinding against another student in music class; leaving school grounds; peeing in a bathroom sink; growling and clenching his fist when confronted for misbehaviors; and having altercations with other students. Unsurprisingly, due to his behavior at school, Jaden had no close friendships. He refused to eat at his class table in the cafeteria, saying the smell of other foods made him gag. According to school staff, Jaden was exhibiting symptoms of anxiety and depression, as well as "an increasing level of defiance and unregulated behavior at school all of which seem to [be] directly related to his lack of stability, structure, and emotional safety at home."

Further, when questioned, Jaden admitted to hitting his mother, including hitting her on the head with "a huge Lego ship I built." Despite the seriousness of Jaden's behaviors, mother had not followed through with recommended steps to get him mental health services. According to school staff, mother was "struggling with her own anxiety, and probable substance use, which has negatively impacted her ability to be a stable,

---

[2] In accord with the usual rules on appeal, we state the facts in the manner most favorable to the juvenile court's challenged order. (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1 (*Janee W.*).)

2

consistent, and dependable parent to Jaden." Staff further reported that mother did not want to hear anything negative about herself, and thus she was not receptive to services and was not doing anything to help her son. Instead, on April 12, 2012, mother brought Jaden to the Daly City Police Department, stating that she could no longer handle him. Later, after talking with the Daly City Mental Health Clinic, mother agreed to take Jaden home, but ended up leaving him with his father for several days.

The Agency was also in receipt of significant evidence that mother had an ongoing substance abuse problem. In February 2012, mother was reported to be a "heavy crystal meth user" with a repeated pattern of leaving Jaden home alone all night while she went to San Francisco to " 'party' and use drugs." Mother claimed to have a neighbor who looked in on Jaden during these times.[3] Further, mother's family reportedly conducted a drug intervention in April 2012, at which mother admitted recent methamphetamine use, but refused help. In addition, since 1997, mother had been diverted on three separate occasions based on drug-related offenses. According to the minor's presumed father, Jalal E., mother did not allow him to have the regular, supervised visitation with Jaden authorized by court order. However, mother would leave Jaden with him when she was "stressed" or wanted to "get high."[4]

Domestic violence was also a concern in this family. Between June 2007 and October 2010, the Agency received three reports regarding domestic violence issues between the parents. During this timeframe, mother had a restraining order against father

---

[3] Indeed, this arrangement appears to have been going on for some time, as the Agency received a comparable report in November 2009 stating that mother was leaving Jaden home alone at night to go out with her boyfriend. Mother similarly claimed at that time that a neighbor located in an upstairs unit in the condominium complex provided sufficient supervision for the then five-year-old minor. Per this same referral, mother was reported to carry a condom filled with Jaden's urine so that she could give a clean urine sample at any time upon request.

[4] Mother and father were married in 2002 and were together in 2004 at the time of Jaden's birth. They are currently separated, but have never been divorced. At the initial hearing in this matter on June 6, 2012, the juvenile court confirmed Jalal's status as Jaden's presumed father.

3

which expired in March 2009.  In fact, father spent two days in jail and 36 months on probation as a result of a 2008 conviction for violating this restraining order, his only reported criminal conviction.  More recently (in April 2012), mother had petitioned for a new restraining order.  Although a temporary order was granted on May 9, 2012, the matter was subsequently dropped when mother failed to appear at a subsequent hearing.  Father did admit that he had been court ordered to complete a 52-week domestic violence program in 2007 so that his visitation with Jaden could be increased, but he had failed to do so.  However, father had found an appropriate program and was scheduled to start on June 4, 2012.

On April 25, 2012, the Agency convened a Team Decision Meeting (TDM) with mother to address the many concerns outlined above.  During this TDM, mother agreed to participate in voluntary services with the Agency, including completion of a mental health assessment and ongoing treatment; completion of a Medi-Cal application; completion of a physical; completion of an alcohol and drug (AOD) assessment; and random drug testing.  Mother also agreed to have Jaden complete a physical and a mental health assessment and engage in mental health services.  After discussing the specifics of the voluntary plan on several occasions, mother signed it on May 3, 2012.  However, when a social worker contacted her on May 8 for a random drug screening, mother claimed to have concerns about the plan.  After the social worker renewed her request for drug testing on May 10, mother hung up on her and later e-mailed an Agency supervisor stating that she had been coerced into signing the plan and was withdrawing her agreement to participate in voluntary services.  Later, she claimed never to have even signed the agreement, despite obvious evidence to the contrary.

As a result, the Agency filed a dependency petition on June 5, 2012, pursuant to subdivisions (b) and (c) of section 300, which reiterated the minor's escalating mental health issues and mother's refusal to engage in voluntary services.  In addition, the petition noted mother's history of substance abuse and domestic violence with father.  At the initial hearing on June 6, 2012, the juvenile court left Jaden in his mother's care, but

4

ordered unannounced home visits by the Agency three times per week and requested an update from the Agency detailing mother's engagement in services.

On June 15, 2012, the social worker submitted an update to the juvenile court indicating that mother had been "extremely uncooperative" since the initial hearing and that he was "very concerned about the child's safety and emotional well-being in the care of his mother." Specifically, mother missed drug testing appointments on June 7 and 11, 2012, causing her to be taken off the testing schedule. After the social worker made a new referral, mother appeared at the testing center on June 14. However, she refused to sign a release so that the Agency could receive the results, and she was extremely hostile and aggressive, screaming and yelling at staff to the point that she was banned from the facility.

Moreover, when the social worker contacted mother on June 11 to schedule a home visit, mother indicated that she intended to sue the Agency, that she would not allow the social worker to see Jaden, and that she would not speak to the social worker without her attorney present. At a meeting in her attorney's office on June 14, mother continued to refuse to provide any information to the social worker and stated that she would not follow through with court-ordered services. She refused to sign a release for Jaden's medical records. She also maintained that the allegations in the petition regarding Jaden's deteriorating behavior were lies and that his behavior had actually improved over the last six months.

Finally, mother refused to allow the social worker into her house at an unannounced visit on June 13. After the police were called, mother eventually let the social worker in, but she yelled and argued with the officer throughout the visit. When interviewed, Jaden stated repeatedly that he wanted to live with his father. He reported that he had been doing nothing but playing with Legos for the several weeks since school ended because his mother slept all day, waking only to feed him. In particular, he stated that his mother was " 'nocturnal, like my cat' " and that he hated that she slept all day. Jaden also confirmed that his mother often goes out at night, sometimes leaving him alone with instructions to contact the upstairs neighbor in an emergency.

5

After reviewing the social worker's interim report at a hearing on June 15, 2012, the juvenile court ordered the minor detained in the home of his father. During the hearing, the judge requested that mother provide the Agency with the minor's whereabouts. Mother initially refused and later provided caregiver information that proved to be false. The juvenile court then suspended the hearing and told mother she could not leave the court house until the minor was found. Later, mother told the social worker that Jaden had run away and that she needed to leave so that she could find him. Eventually, the Agency located Jaden without mother's assistance—at the local boy's and girl's club—and he was detained at approximately 5:00 p.m. Reportedly, Jaden was very happy to see his father at that time.

On June 20, 2012, the Agency filed an amended petition in this matter which included the original allegations and added information regarding mother's subsequent lack of cooperation. In its report filed in connection with the amended petition, the Agency stated that it was "extremely concerned that [mother] has untreated substance abuse issues and undertreated mental health issues that are impacting her ability to care and be available for her child." At the contested detention hearing on June 21, 2012, Jaden was formally detained in his father's home pending further hearing.

The combined jurisdiction and disposition hearing in this matter was continued repeatedly—and numerous social worker reports were filed—before it finally took place on September 24, 2012. During this timeframe, father reported that he first noticed mother using drugs in 2007-2008 during graduate school in order to stay awake. According to father, mother's drug use had been getting worse and, when he started to confront her about it, she restricted his contact with Jaden. In November 2011, he was called to drive mother to the emergency room for kidney failure, which he believes was the result of drug use. The interventionist that met with mother and her family on April 22, 2012, confirmed that mother had admitted to methamphetamine use as recently as three days prior to the intervention. In the opinion of the interventionist—who had been working in the field for many years—mother had all of the signs of a person with a serious methamphetamine addiction. He further stated that mother has historically shown

the ability to mask drug screens and refuse testing until the drugs are out of her system. Mother's sister reported that mother had been using drugs since she was 20 years old, and that she had to take a year off from college after she got addicted to heroin. Although mother had been sober while pregnant with Jaden, she resumed her drug use when he was approximately two years old. According to mother's sister, mother had been using drugs "very hard" for the last three years, following the suicide of their brother. Mother's mother and stepfather gave similar reports. And, mother's probation officer reported that mother had been terminated from outpatient drug treatment on three occasions in 2008 (for substance abuse, continually providing diluted urine samples, and nonattendance) before she was able to successfully complete a three-month program in 2009.

Additionally, the Agency submitted school records to the court revealing that Jaden had been absent a total of 13 days and tardy on 77 occasions during the 2011-2012 school year. Moreover, the program director for the local boy's and girl's club was threatening to kick Jaden out because mother could not follow the rules and Jaden was picked up over an hour late every day. Indeed, the club director indicated that "in all of his years" mother was the most inconsistent person he had ever met and that he had caught her in several lies. For instance, her excuse for being late three days in a row was that she had a flat tire. Both the club director and the school reported that mother constantly made empty promises to Jaden which would result in emotional meltdowns when she failed to follow through. Neither felt she was available to meet Jaden's emotional needs. Also of concern was the fact that—in August 2012—Jaden disclosed to both his father and the social worker that, on the day mother had taken him to the police station in April, she had tied him to a chair and whipped him with a belt. Jaden stated that he was scared and that it was the worst day of his life.

With respect to her supervised visitation with Jaden, mother was often late and made a host of inappropriate comments regarding Jaden's placement with his father, despite multiple attempts at redirection by the social worker. She was also unsupportive of Jaden's participation in therapy, telling him it was " 'not safe' " to speak with a counselor. During visits, mother often talked continuously, asking Jaden multiple

7

questions and then answering the questions for him before he could respond. In addition, she often attempted to pit Jaden against the Agency.

Further, during this period, it became increasingly clear that Jaden was extremely attached to his cat, Pinkie. Jaden told the social worker that his cat had been his best friend for the last four years and that, while he wanted to live with his father, he also wanted to live with his cat. Mother, unfortunately, repeatedly used Jaden's affection for Pinkie in attempts to manipulate him. For instance, mother told Jaden: " 'Why see your cat once, when you could see him everyday if you were living with me.' " Or: " 'You can see the cat anytime you want as far as I'm concerned. Security is standing in our way. I would take you if I could. Seems like you are under arrest.' " When Jaden had difficulty separating after visits with his mother and cat—going so far as to lock himself in his mother's car—mother was unhelpful, indicating that she did not agree that Jaden should be going back to his father's house. Finally, after Jaden became extremely emotional at the end of a visit on August 15, 2012, he disclosed to the social worker that mother had told him on the phone that his cat was sleeping on Jaden's bed all day and was barely eating because she missed him so much. Mother reportedly put Pinkie on the phone, and the "cat" said she missed Jaden and wanted him to come home. At a hearing on August 23, 2012, the juvenile court ordered mother to deliver Pinkie to the Agency within 24 hours. Jaden was much happier once his cat was able to live with him at his father's house.

Mother did complete an AOD assessment over the course of two days on June 26 and July 3, 2012. However, when asked to drug test at the end of the first session, mother said "she was not ready to test" and slowly began drinking water. After waiting in the office for three hours (during which time she was reported to be unkempt, dissociating, and hard to connect to), mother ultimately stated that she had diarrhea and therefore could not test. Mother also failed to test on June 27. She was, though, able to test clean on July 3 after the second session, and reportedly also tested clean on July 2. Ultimately, however, the assessment was based on self-reporting, and mother indicated to the evaluator that she had no problems with drugs or alcohol. Thus, the evaluator concluded

that AOD treatment was "not clearly indicated at this time" and recommended that mother complete a psychological evaluation. The Agency expressed concern that mother's self-report during her AOD assessment "does not reflect fact" and continued to maintain that residential treatment was required. Thereafter, mother failed to appear for eight additional drug tests during the month of July 2012.

In the meantime, Jaden's father, who works as a taxi driver, changed his schedule so that he could be home with Jaden at night and for school drop offs and pickups. He was working with the maternal family to provide childcare when necessary. He was also committed to continuing his 52-week domestic violence program. In addition, father was reported to be "extremely supportive" of his son's behavioral and mental health needs and had begun working with Jaden's counselor to address those needs. Indeed, father stated that he wanted to work closely with Jaden's counselor so that he could gain insight into how to best support Jaden emotionally and behaviorally. He further reported that he would like mother to get the help she needs so that she could remain active in Jaden's life. Jaden, for his part, had expressed the desire to live with his father and indicated that he had no safety concerns regarding him. The two were reported to be "very well bonded." Importantly, since his placement with his father, Jaden's behaviors had begun to improve. Jaden was going to his new school daily, doing his homework consistently, and had begun to make friends.

At the conclusion of the contested jurisdiction and disposition hearing on September 24, 2012, the juvenile court sustained the petition (after minor amendments were made in open court), finding Jaden to be a child described by subdivisions (b) and (c) of section 300. Thereafter, Jaden was declared to be a juvenile court dependent, removed from his mother's care, and placed in the home of his father. The juvenile court ordered family maintenance services for father and family reunification services for mother. Specifically, mother was ordered to participate in random drug screening, a mental health evaluation, a substance abuse assessment, and a parenting class.

9

Supervised visitation with mother was ordered to be therapeutic until the social worker deemed it unnecessary. A six-month review was set for March 2013.[5]

However, on December, 10, 2012, the Agency requested that the court hold an interim review due to mother's lack of progress on her reunification plan. Specifically, the Agency reported that, except for visitation, mother was not complying with any of her court-ordered services. Instead, she sent numerous e-mails to the social worker and her supervisors stating that the Agency had filed a bogus petition and requesting the return of her son. At a visit on October 24, 2012, when the social worker attempted to coordinate an appointment for her psychological evaluation, mother told the worker to stop harassing her. When the social worker reminded mother about her drug testing requirement at a visit on November 28, 2012, mother argued that she was not to be forced and that she did not have to get drug tested.

Of even more concern, mother repeatedly demonstrated a disregard for the court's orders. For instance, when she was told at the October 24 visit that she could not take Jaden trick-or-treating on Halloween, she responded that she would see about that. At the end of that visit, Jaden refused to leave, hitting the therapeutic visitation supervisor and calling him and the social worker names. Mother called to Jaden from outside of the building, telling him that she had a plan and would "rescue" him and demanding he be allowed to leave with her. This made Jaden even more upset, and it took almost an hour for the social worker to get him into the car for the ride home. As they left the parking lot, mother (who had waited in the parking lot for over an hour) began to follow them in her car. The social worker pulled over to call the police, only to be told that mother had already contacted them to report that there were problems with the father harming the child and that she was on her way to file a complaint against the father and the Agency. Father later reported that mother had shown up at his house that evening, yelling at him about Jaden's medication. He did not answer the door or her telephone calls. According

_____

[5] Mother's appeal from these jurisdictional and dispositional orders was dismissed by this court on March 14, 2013, after a no-issue statement was filed by appellate counsel. (See *In re J.E.* (A136723).)

to father, mother also attempted to drop nonprescription medication off at Jaden's school and was asked to leave by staff.

Further, although mother was expressly told on October 30, 2012, that she could not attend the Halloween parade at Jaden's school, she went to the parade in costume the next day and took a picture with Jaden. The school again had to ask her to leave. Later, mother e-mailed a copy of the picture to the social worker and the Agency. Similarly, a maternal aunt reported that mother had shown up on her doorstep on Thanksgiving Day while Jaden was present. Mother called out to Jaden and gave him some gifts before leaving. At the interim hearing on December 17, 2012, the juvenile court admonished mother to follow the court orders. Mother, for her part, assured the juvenile court that she would make herself available for a psychological evaluation and drug testing.

In its report for the six-month review, the Agency recommended that mother's reunification services be terminated and that Jaden remain with his father under a plan of family maintenance. At that point, mother had still not followed through with random drug testing, despite her assurance to the juvenile court in December 2012 that she would do so.[6] Additionally, although mother consistently attended her weekly therapeutic visits with Jaden, she was chronically late (an average of 20 minutes late for the 90-minute visits) and used the visits to interrogate Jaden repeatedly about how his father was caring for him. In addition, mother attempted to pit the minor against the Agency at visits, blaming the Agency for "kidnapping" Jaden from her.[7] The therapeutic visit supervisor recommended that visitation cease, stating: "The therapeutic aspect of [the visits] was not possible due to [mother's] defensiveness, verbal reactivity and inability to

---

[6] According to the social worker, when she talked with mother after the December hearing, mother did not indicate a willingness to drug test. In fact, the social worker believed mother had purposefully failed to participate regularly in court-ordered services, stating: "I think she's made a conscious—you know, she's made a decision not to do what's been ordered by the Court."

[7] Indeed, mother had contacted the police on two occasions, alleging that the Agency social worker had kidnapped her child. According to the social worker, she was not removed from the case because mother had similar issues with every other social worker she had been assigned.

acknowledge her own deficiencies as a mother and her inability to identify potential areas for growth." In his opinion, any visitation at all was detrimental for Jaden—negatively affecting his emotional well-being—and should be suspended.

Mother did eventually complete a psychological evaluation, although it took five appointments instead of the usual two due to three last-minute cancellations by mother. As a result of the evaluation, mother was diagnosed with obsessive-compulsive personality disorder with histrionic and paranoid personality features. According to the evaluation, mother's "parent-to-child bonding appears to be uneven, and her ability to consistently place her child's interest above her own may be detracted from by her own emotional wounds that are not being addressed." Further, mother "is tense in her mannerisms, and the rapid tempo of her speech suggests either an extremely high level of anxiety, a manic state or drug use." Despite these identified concerns, the social worker testified that mother had not engaged in mental health counseling of any kind and was unwilling to take recommendations for treatment.

In addition, mother blatantly continued to ignore the juvenile court's directive that all of her contact with Jaden be supervised. On April 28, 2013, she sent Jaden a package of Legos in the mail which contained a "private" letter accusing the Agency and Jaden's extended family of lying to the court to keep him away from her; telling Jaden that his good behavior with his father would be used as evidence that he should never return to her care; admonishing Jaden to write down every bad thing happening to him so the judge could learn the "truth"; repeatedly characterizing Jaden's father as an angry, violent man; and asking Jaden to contact her outside of the court process through e-mail. Mother instructed Jaden to disclose this "important secret message" to no one, but Jaden—very upset and crying—showed it to his father and stated that he "wants her to stop doing these things." Later, when Jaden confronted his mother during a visit stating that his " 'dad is not a bad dad,' " but that he had received a letter saying his dad was "really bad," mother denied ever sending it.

Further, on May 1, 2013, mother appeared at the fence at Jaden's school, where she talked with him and gave him candy. On May 6, Jaden told his school counselor that

12

his mother had been putting notes in the items she sends home with him and that these notes upset him. In addition, on Jaden's birthday that month, mother reportedly got into Jaden's school and went to his second-floor classroom, where she left ice cream and candy (items not allowed at the school). Later, when she returned to the school and was asked to leave, she became very argumentative, belligerent, and threatening towards the principal. As a result, the police were called, Jaden's teacher kept her classroom door locked, Jaden did not want to go outside for recess or PE as he was worried his mother would be at the fence, and Jaden's father picked him up in the school office. On May 21, 2013, Jaden's school reported that mother was parked outside at dismissal. Father confirmed this and stated that mother was also in the parking lot that day when they went to the grocery store and later came by the house, bringing Jaden a pair of shoes. Finally, the transportation officer noted that Jaden was very upset after his May 22 visit with his mother. According to Jaden's father, the boy had been upset by the visit because his mother told him that she planned to kidnap him on the next Wednesday (May 29), and Jaden was frightened.

After the May 22 visit, and away from Jaden, the social worker attempted to discuss with mother the school's concerns regarding her unannounced visits. Mother, however, refused to listen and yelled at the social worker. The next day, she sent an e-mail to various Agency personnel claiming that she had been "harassed and threatened" by the social worker, who ordered her not to go to her son's school. Mother expressed that it was "no secret" that she had been very involved with Jaden's school life before the Agency "illegally" placed Jaden with his "violent, abusive, neglectful father." She claimed that, after that placement, she only went to Jaden's school when she was "required to" because Jaden was being neglected. She suggested that all Agency employees "read, understand, & at all times adhere to the US constitution, Bill of Rights, applicable state and federal laws, and the [Agency's] current guidelines & procedures that are not in violation of the law." Finally, she asserted that the Agency's "deplorable actions" against her family would "not go unpunished." As aptly summarized by the social worker: "The mother does not appear to have a grasp as to what her part of the

13

current situation is. She believes that everyone in her life is wrong and out to get her and to keep her away from her son, . . ."

Throughout this period, Jaden became increasingly frustrated by his visitation with his mother. In March 2013, Jaden told his school counselor that he understood that his mother could not care for him and that all she does is ask him questions. The counselor further reported that Jaden is very stressed by visits with his mother, but feels he needs to be with her to "take care of her." In April 2013, after waiting for 30 minutes for his mother to arrive at a scheduled visit, Jaden stated: "I sometimes don't want to see or talk to my mom . . . sometimes . . . everyday." By May 2013, Jaden was reporting to both his school counselor and his Agency social worker that he "needs a break" from visits with his mother.

In contrast, father was reported to be providing Jaden with a safe and nurturing home, and the two were described as having a "very good" relationship. Specifically, at father's house there are rules and Jaden "knows what the rules are and what the consequences are if he breaks the rules." Moreover, although Jaden's significant behavioral issues continued at the beginning of the school year at his new school, they had "diminished," and he was doing "much better in all behavioral areas." In fact, Jaden has been able to make friends at school, which he had not been able to do in the past, and actually had friends over to his home for play dates. Further, although Jaden had been seeing a behavioral therapist at home and school, he was doing so well in both venues that he "graduated" from the program.

Based on this evidence, and after a three-day contested hearing on the matter, the juvenile court terminated mother's reunification services on May 31, 2013, leaving Jaden in the home of his father under a family maintenance plan. The court expressly found the testimony of the social worker and the therapeutic visitation supervisor to be "very credible," while mother was found to be "not credible on the stand." Although recognizing that mother is an intelligent and highly educated woman and that she loves Jaden, the juvenile court opined that she "completely lacks insight into how her demeanor and how her behavior impacted her son." In addition, despite the fact that mother

14

completed some evaluations and visited with the minor, the court found that she had made *no* progress in solving the problems that led to Jaden's initial removal, stating that mother is "obstinate and belligerent" and does not feel that she needs services to reunify with Jaden. The juvenile court concluded that, even if additional referrals for services had been made to mother in writing, she would not have participated.

Noting that "Jaden is thriving in his father's home," the court ordered once-a-week supervised visitation for one hour between mother and Jaden. Telephone calls supervised by the Agency were limited to once per week for 20 minutes, with Jaden given the discretion to end a call early. Finally, mother was ordered to stay away from both Jaden's school and his home. Mother's timely notice of appeal, filed July 1, 2013, brought the matter before this court.

## II. DISCUSSION

Mother's sole argument on appeal is that the Agency failed to provide her with reasonable reunification services. Thus, she claims, the juvenile court's finding that reasonable services were offered to her was erroneous, and its subsequent order terminating those services must be reversed. She requests an order on remand that she be provided with six additional months of services. Because we conclude that a reasonable services finding need not be made at a hearing monitoring a dispositional placement with a previously noncustodial parent, we reject mother's contentions.[8]

### A. *Placement with a Noncustodial Parent Pursuant to Section 361.2*

As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services pursuant to section 361.5 to "the child and the child's mother and statutorily presumed father." (§ 361.5, subd. (a).) The purpose of these reunification services is "to facilitate the return of a dependent child to parental custody." (*In re Jodi B.* (1991) 227 Cal.App.3d 1322, 1326, italics omitted; see also *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 [purpose of reunification efforts is to "eliminate the conditions

---

[8] We asked for and received supplemental briefing on this issue from the parties.

15

leading to loss of custody and facilitate reunification of parent and child" thereby furthering the "goal of preservation of family, whenever possible"].) Unless an express exemption exists, reunification services provided pursuant to section 361.5 are mandatory, subject to strict timelines, and monitored through periodic court reviews at which parents are admonished that failure to participate successfully in reunification efforts could lead to the termination of their parental rights. (§§ 361.5, 366.21 & 366.22.)

The Juvenile Court Law, however, provides an alternate track for minors who are removed from a parent when a previously noncustodial parent is available and requests custody of the child. Specifically, subdivision (a) of section 361.2 provides: "When a court orders removal of a child pursuant to Section 361, the court *shall first determine* whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Italics added.) Once the juvenile court places a minor with a previously noncustodial parent in accordance with this statute, it has three dispositional options. It may grant custody to the previously noncustodial parent and terminate dependency jurisdiction. (§ 361.2, subd. (b)(1).) It may order that a home visit be conducted within three months of the minor's new placement and that the results of that visit be provided to the court before it takes further action with respect to custody of the minor. (§ 361.2, subd. (b)(2).) Or, it may order that the previously noncustodial parent "assume custody" of the minor subject to the supervision of the juvenile court. (§ 361.2, subd. (b)(3).) If the court chooses option three, it "may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to

16

both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."[9] (*Ibid.*)

The interplay between section 361.5 and section 361.2—which were enacted simultaneously by the Legislature in 1986—has been the subject of some discussion in the courts. (See, e.g., *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 53–54; *Janee W.*, *supra*, 140 Cal.App.4th 1444; *In re Erika W.* (1994) 28 Cal.App.4th 470, 475 (*Erika W.*) see also Stats. 1986, ch. 1122, §§ 12, 13, pp. 3982–3986.) In *Erika W.*, for instance, the Sixth District Court of Appeal concluded that mandatory reunification services pursuant to section 361.5 need not be provided to a previously custodial parent when a child is removed from that parent and placed in the custody of a previously noncustodial parent. (*Erika W.*, *supra*, at pp. 475–476.) Under these "limited" circumstances the court held, section 361.2 "invests the juvenile court with discretion as to the provision of reunification services to the parents." (*Erika W.*, *supra*, at p. 475.) The *Erika W.* court reasoned that—since both statutes were part of the same legislative act—"the only rational intent which can be ascribed to the Legislature is the intent to enforce *a different set of rules regarding the provision of reunification services* in those cases where custody of a minor is shifted from one parent to another parent." (*Erika W.*, *supra*, at p. 475, italics added; see also *ibid.* ["we find it impossible to conclude that section 361.5 intended to make mandatory that which simultaneously enacted section 361.2 . . . explicitly made discretionary"].)

In *In re Nicholas H.* (2003) 112 Cal.App.4th 251 (*Nicholas H.*), Division Two of the First District Court of Appeal was faced with a situation similar to that at issue in the present case. In those proceedings, Nicholas was removed from his mother, Kimberly, and placed in the home of Thomas, his presumed father. Both parents were given services. (*Id.* at p. 257.) At a subsequent hearing, the court terminated mother's

---

[9] Section 366 provides, in relevant part, that "[t]he status of every dependent child *in foster care* shall be reviewed periodically as determined by the court but no less frequently than once every six months, as calculated from the date of the original dispositional hearing, until the hearing described in Section 366.26 is completed." (§ 366, subd. (a)(1), italics added.)

17

reunification services, granted sole physical custody of Nicholas to Thomas, and dismissed dependency. (*Id.* at p. 258.) Kimberly argued on appeal that the juvenile court was required to return Nicholas to her care at the review hearing at issue, absent a finding that to do so would create a substantial risk of detriment to Nicholas's safety, protection, or physical or emotional well-being. (*Id.* at p. 262.) Such a detriment finding is required at 6, 12 and 18-month review hearings when a minor has been placed in foster care and reunification services are provided pursuant to section 361.5. (See §§ 366.21, subds. (e) & (f), 366.22, subd. (a).)

The appellate court disagreed. Although it confirmed that review hearings are to be held pursuant to section 366 when a child is placed with a previously noncustodial parent in accordance with section 361.2, it concluded that this was simply to ensure that "dependent children who have been placed with a previously noncustodial parent rather than in foster care also receive meaningful and expeditious periodic review of their cases." (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 265.) The court went on to reject the view that the procedures prescribed by section 366 *et seq.* (including the detriment finding required by sections 366.21 and 366.22) "must be rigidly applied and followed verbatim when the status review is of a child who has not been placed in foster care." (*Nicholas H.*, *supra*, at p. 265.) Noting that "[a] parent placement poses very different considerations for the juvenile court than does a foster care placement" and that "those considerations must govern any reasonable interpretation of section 366 et seq. as it applies to dependent children who have been placed with a previously noncustodial parent," the court concluded that no detriment finding was necessary. (*Id.* at pp. 265–267.)

Instead, the *Nicholas H.* court held that the issue to be resolved at a hearing reviewing placement with a noncustodial parent is expressly stated in section 361.2, itself. (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 267.) Specifically, that statute "directs that 'at review hearings held pursuant to Section 366,' the court must determine 'which parent, if either, shall have custody of the child.' " (*Ibid.*) Further, when making such a

custody determination, "the court's focus and primary consideration must always be the best interests of the child." (*Id.* at p. 268.)

Three years later, in *Janee W.*, *supra*, 140 Cal.App.4th 1444, the Second District Court of Appeal addressed the issue of reunification services in the context of a section 361.2 placement. In that case, two minors were placed with their previously noncustodial father at the six-month review hearing. (*Janee W.*, *supra*, at pp. 1448–1449.) At the 12-month review hearing, the juvenile court indicated that it did not believe that reasonable services had been offered to the mother during the previous six months. (*Id.* at p. 1453.) However, since the children were safe in their father's care, the juvenile court awarded full legal and physical custody of the minors to the father and terminated dependency jurisdiction. (*Id.* at pp. 1449–1450.) Citing the then-relevant court rule, the appellate court first noted that a placement with a noncustodial parent pursuant to section 361.2 can occur at subsequent review hearings even though, by its terms, section 361.2 applies only when a court first takes jurisdiction over a minor. (*Janee W.*, *supra*, at p. 1451.)[10] It then broadly concluded that the statutory and rule provisions entitling a parent to reasonable reunification services "are inapplicable when a child is removed from the custody of one parent and placed with another under section 361.2." (*Id.* at p. 1453.) Specifically, in the context of that particular case, the court held that "even if reunification services are offered to the previously custodial parent, once the dependency court determines that further supervision of the children in the home of the previously noncustodial parent is not required, the failure to provide adequate reunification services to the other parent

---

[10] Currently, rule 5.708(k) provides that "[i]f at any review hearing the court places the child with a noncustodial parent, or if the court has previously made such a placement, the court may, after stating on the record or in writing the factual basis for the order: [¶] (1) Continue supervision and reunification services; [¶] (2) Order custody to the noncustodial parent, continue supervision, and order family maintenance services; or [¶] (3) Order custody to the noncustodial parent, terminate jurisdiction, and direct that *Custody Order—Juvenile—Final Judgment* (form JV-200) be prepared and filed under rule 5.700." This general procedure is applicable at each of the 6, 12, and 18-month reviews. (See rules 5.710(b)(2) [6-month review], 5.715(b)(3) [12-month review], & 5.720(b)(2) [18-month review].)

does not prevent the court from terminating jurisdiction under section 361.2." (*Id.* at p. 1455.)

Finally, in *In re A.C.* (2008) 169 Cal.App.4th 636 (*A.C.*), the Fourth District Court of Appeal discussed the interplay between section 361.5 and section 361.2 when parents receive some services under each provision. In *A.C.*, the two minors were removed from their mother's home and, prior to disposition, placed with their previously noncustodial father. At the May 2006 dispositional hearing, family maintenance services were ordered for father. (*Id.* at pp. 639–640.) Mother was offered "enhancement services," defined as nonreunification child welfare services designed to "enhance the child's relationship with that parent by requiring that parent to address the issues that brought the child before the court." (*Id.* at pp. 640, 641–642 & fn. 5.) Thereafter, the minors were removed from their father's custody in September 2007 pursuant to a section 387 supplemental petition and placed with a relative. (*A.C.*, *supra*, at p. 640.) At the November 2007 dispositional hearing on the supplemental petition, reunification services were ordered for both parents pursuant to section 361.5. After these reunification services were continued at the June 2008 six-month review, the minors appealed, arguing that both parents had already received more than the 18 months of child welfare services statutorily authorized by section 361.5 and that the continuation of such reunification services was therefore improper. (*A.C.*, *supra*, at pp. 639–640.)

The *A.C.* court disagreed with the minors, holding that the continuation of reunification services at the six-month review was appropriate. (*A.C.*, *supra*, 169 Cal.App.4th at p. 639.) Specifically, the court concluded that the "[s]ection 361.5 time limits for reunification services start to run when a child is removed from all parental custody at the disposition hearing." (*Ibid.*) In contrast, "[t]he clock does not start running when the child is placed with a noncustodial parent pursuant to section 361.2." (*Ibid.*)[11] Thus, in *A.C.*, the parents were entitled to a full complement of reunification

---

[11] In this way, services provided pursuant to section 361.2 were viewed as similar to family maintenance services provided under section 362, subdivision (c), when a dependent minor is maintained in the family home. There are no statutory time limits on

20

services based on the minors' November 2007 removal from the custody of both parents, despite the previous provision of section 361.2 services. (*A.C., supra,* at p. 649; see also *In re T.W.* (2013) 214 Cal.App.4th 1154, 1167–1169 (*T.W.*).)

Applying these precedents to the circumstances of this case, we conclude that the child welfare services provided herein pursuant to subdivision (b)(3) of section 361.2 were wholly discretionary and analytically distinct from the mandatory reunification efforts required by section 361.5. (See *A.C.*, *supra*, 169 Cal.App.4th at pp. 648–649; *Erika W.*, *supra*, 28 Cal.App.4th at p. 475; compare *Joel T.*, *supra*, 70 Cal.App.4th at pp. 267–268.) As the *Joel T.* court noted: "The distinction between the services provided when the minors remain in parental custody and when the minors have been removed from parental custody is a subtle but important one. Services designed merely to support a family's functioning may or may not be the same as those designed to reunify a family even if the ultimate goal in each case is to ameliorate the problems which led to the dependency at the outset." (*Joel T.*, *supra*, at p. 268.) Additionally, a parent's level of engagement in section 361.2 services may differ when the expectation of a time line for that parent to complete those services, "facing ultimate termination of parental rights under an advisement," is not in place. (See *A.C.*, *supra*, at pp. 648–649.) Moreover, "[c]hildren who are placed with at least one of their parents from the beginning of the dependency are differently situated than those who immediately enter foster care. Such a

the provision of family maintenance services. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 312.) Rather, at review hearings held at six-month intervals, the juvenile court may continue such services if it determines that "conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c); *Janee W.*, *supra*, 140 Cal.App.4th at p. 1450.) Thus, at issue is whether "continued supervision is necessary." (§ 364, subd. (c).) In *In re Joel T.* (1999) 70 Cal.App.4th 263 (*Joel T.*), the Third District Court of Appeal concluded that, when a minor is removed from parents who have been receiving family maintenance services, those family maintenance services cannot be counted as section 361.5 reunification services. Instead, the court must still provide such parents with the full measure of statutorily mandated reunification services pursuant to section 361.5, based on the minor's subsequent removal from parental custody. (*Joel T.*, *supra*, at pp. 267–268.)

21

child, in most cases, is not suffering from the same level of disruption and need for prompt permanency adjudication as he or she might otherwise experience in a foster care placement." (*A.C.*, *supra*, at p. 652; see also *Erika W.*, *supra*, at p. 478 [when a child is placed with a noncustodial parent, the goal of returning a dependent minor to parental custody has already been met and therefore "reunification services are not necessary"].)

We further agree with the *Nicholas H.* court that—while review hearings are to be held pursuant to section 366 when a child is placed with a previously noncustodial parent pursuant to subdivision (b)(3) of section 361.2—this does not mean that all of the procedures prescribed by section 366 *et seq.* "must be rigidly applied and followed verbatim when the status review is of a child who has not been placed in foster care." (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 265.) Rather, the understanding that "[a] parent placement poses very different considerations for the juvenile court than does a foster care placement," will guide our interpretation of section 366 et seq. as it applies to the section 361.2 placement at issue in this case and the necessity for a reasonable services finding. (Compare *Nicholas H.*, *supra*, at pp. 265–267.)

In addition, when determining whether a reasonable services finding should be "rigidly applied" to the facts of this case, we also find crucial the *A.C.* court's analysis of the differences between the reunification services offered pursuant to section 361.5, the services provided in connection with a noncustodial parent placement under section 361.2, and the family maintenance services authorized by section 362. Specifically, we endorse the *A.C.* court's statement that "a section 361.2 placement with a noncustodial parent should be treated in the same manner as a section 362 placement with a custodial parent. In either case, the time limits for services set forth in section 361.5 do not apply if dependents are not removed from the custody of both parents at the dispositional hearing." (*A.C.*, *supra*, 169 Cal.App.4th at p. 649.) Indeed, "[d]espite the existence of an actual (if brief) removal from the parent's 'custody' (or 'physical custody') between the initial detention and the dispositional hearing, section 361.5 is inapplicable in the absence

22

of a disposition ordering a placement with someone other than a parent." (*A.C.*, *supra*, at p. 650; see also *T.W.*, *supra*, 214 Cal.App.4th at pp. 1167–1169.)[12]

Here, Jaden was placed with his previously noncustodial father at the September 2012 dispositional hearing. As a consequence, the section 361.5 reunification "clock" did not begin to run against either parent and the potential termination of their parental rights was not an issue for them. (*T.W.*, *supra*, 214 Cal.App.4th at pp. 1169–1170.) Rather, if Jaden was subsequently removed from the custody of his father through the filing of a section 387 supplemental petition, both parents would still be entitled to a full complement of section 361.5 reunification services before facing the possibility that their parental rights could be terminated and Jaden permanently removed from their care. (See *T.W.*, *supra*, at pp. 1169–1170.) Under such circumstances, we believe that the juvenile court was not required to make a reasonable services finding pursuant to subdivision (e) of section 366.21 before terminating the discretionary reunification services mother was receiving under subdivision (b)(3) of section 361.2. To be sure, the quality of the reunification services provided to a formerly custodial parent and that parent's level of participation in those services are valid and relevant considerations when the juvenile court is reviewing a section 361.2 placement. However, the court's focus should not be on the reasonableness of those services per se, but rather on which parent, if either, should receive custody of the child and whether further court supervision is warranted.

---

[12] We recognize that in *In re N.M.* (2003) 108 Cal.App.4th 845 (*N.M.*), the Fourth District Court of Appeal held that the timelines for reunification services under 361.5 begin for both parents if the child is detained from their custody at the *onset of the dependency action*, regardless of whether the court grants one parent custody at the dispositional hearing under a family maintenance plan. (*N.M.*, *supra*, at pp. 853–855.) *N.M.* is arguably factually distinguishable (being in essence a family maintenance case) and interpreted an earlier version of section 361.5. (*T.W.*, *supra*, 214 Cal.App.4th at pp. 1167–1168; see also *A.C.*, *supra*, 169 Cal.App.4th at pp. 647–648.) More importantly, however, we believe that its analysis ignores the crucial distinction between temporary detention and removal from parental custody after all necessary findings are made. Thus, to the extent our decision conflicts with the rationale of *N.M.*, we—like the courts in *A.C.* and *T.W.*—disagree with *N.M.* (See *A.C.*, *supra*, at pp. 649–650; see also *T.W.*, *supra*, at pp. 1167–1169.)

23

(Compare *Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268; see also *T.W.*, *supra*, at p. 1168 [court's "goal" when reviewing a placement under section 361.2 is "to provide a stable, permanent parental home" for a dependent minor "through services under section 361.2, with the possibility of eventually giving permanent custody of [the minor] to one or the other parent"].)[13]

In sum, where, as here, a dependent minor is not removed from the custody of both parents at the dispositional hearing and services are provided pursuant to subdivision (b)(3) of section 361.2, we conclude that no reasonable services finding need be made at the periodic review hearings monitoring that placement.[14]

---

[13] We note that, when a dependent minor is not placed with a parent at disposition and mandatory reunification services are offered pursuant to section 361.5, that statute expressly provides that "[p]hysical custody of the child by the parents . . . during the applicable time period [for the provision of section 361.5 services] shall not serve to interrupt the running of the time period." (§ 361.5, subd. (a)(3).) Thus—even if the child is subsequently returned to a parent and section 361.2 is invoked because that parent was previously noncustodial—the applicable timelines for reunification services are still running and the parents continue to be faced with the possibility that, if reunification efforts are ultimately unsuccessful, their parental rights could be terminated. While we need not reach this issue, it is arguable that, under such circumstances, a reasonable services finding might be required if juvenile court supervision is continued. (Compare *In re Calvin P.* (2009) 178 Cal.App.4th 958 [where mother and father were granted reunification services pursuant to section 361.5 reasonable services must be found to have been provided to mother despite fact that minors were subsequently returned to father's care under family maintenance plan].)

[14] We agree with mother that *Janee W.* does not necessarily mandate this result. However, we believe the holding in *Janee W.* is consistent with our determination. As discussed above, *Janee W.* holds that the failure to provide adequate reunification services to a previously custodial parent does not prevent the court from terminating jurisdiction under section 361.2 once the juvenile court determines that supervision of the placement with a previously noncustodial parent is no longer required. (*Janee W.*, *supra*, 140 Cal.App.4th at p. 1455.) In that situation, as in the present circumstances, failure to comply with arguably inadequate reunification services could not later be used as the basis for termination of parental rights because custody has been returned to a parent and dependency dismissed.

24

**B.** *No Abuse of Discretion*

Having determined that no reasonable services finding was required at the May 2013 review hearing in this matter, we next consider whether the juvenile court's order terminating mother's section 361.2 services was otherwise supportable. As stated above, under subdivision (b)(3) of section 361.2, "[t]he decision whether to provide services and to which parent is discretionary to the court because the child is not out of the home, but in placement with a parent." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651; *Erika W.*, *supra*, 28 Cal.App.4th at p. 475.) We will therefore uphold the juvenile court's decision to terminate mother's reunification services in this case unless that decision amounted to an abuse of discretion. As has been oft repeated, when we review a juvenile court order for abuse of discretion, the " 'appropriate test . . . is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*), quoting *Walker*.) Accordingly, we will not reverse the juvenile court's decision unless that court " 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination . . . .' [Citation.]" (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421–422 (*Geoffrey G.*); *Stephanie M., supra*, at p. 318, quoting *Geoffrey G.*)

Whether the juvenile court abused its discretion in this instance is further informed by the statutory context within which its decision to terminate mother's section 361.2 services was made. When a minor is placed with a previously noncustodial parent pursuant to subdivision (b)(3) of section 361.2, the juvenile court is required to determine, "at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child." When making such a determination, as in any dependency case, "the court's focus and primary consideration must always be the best interests of the child." (*Nicholas H., supra*, 112 Cal.App.4th at p. 268; see § 202, subd. (d); see also *In re B.T.* (2011) 193 Cal.App.4th 685, 692 ["[t]he paramount concern of any dependency proceeding is the child's best interests"].) Further, section 361.2 "expressly contemplates

25

that reunification services will be offered only for the purpose of facilitating permanent parental custody of the child by one or the other parent." (*Erika W.*, *supra*, 28 Cal.App.4th at p. 476.) Thus, if "the previously custodial parent has the potential to provide a safe stable permanent home for the child, reunification services can be offered to the previously custodial parent in the hope that this parent will remedy his or her deficiencies and reunify with the child." (*Id.* at p. 477.) On the other hand, the court may order that services be provided solely to the previously *noncustodial* parent "in order to allow that parent to retain later custody without court supervision." (§ 361.2, subd. (b)(3).) Finally, if a dependent has been placed with a formerly noncustodial parent, the court shall determine at each six-month review "whether supervision is still necessary." (§ 366.21, subd. (e); see also rules 5.708(k), 5.710(b)(2), 5.715(b)(3) & 5.720(b)(2).)

When the juvenile court's decision to terminate mother's section 361.2 services is viewed within this framework, it is abundantly clear that no abuse of discretion has occurred. At the outset of this opinion, we recounted in detail the facts underlying this matter, and we will not rehash them here. Suffice to say that the evidence overwhelmingly supports the conclusion that, at the time of the six-month review in May 2013, mother did not have the potential to provide a safe, stable, or permanent home for Jaden. Moreover, it was also evident that it was in Jaden's best interests to focus on father as the parent most likely to retain later custody without juvenile court supervision. (See § 361.2, subd. (b)(3).) Jaden was thriving in his father's care. In contrast, mother had made no progress in solving the problems that led to Jaden's initial removal; continued to obstinately and belligerently maintain that she did not require any services to reunify with the minor; and remained completely oblivious to the significantly detrimental impact that her actions were having on her son. Further, given mother's erratic behaviors, her inability to work with father in Jaden's best interests, and her propensity to ignore court orders, it was reasonable for the court to conclude that

26

continued supervision of the situation by the juvenile court was appropriate.  In sum, we find the juvenile court's order in this case to be entirely proper.[15]

## III.  DISPOSITION

The judgment is affirmed.

---

[15] While there was clearly some confusion in the juvenile court as to the necessary findings to be made at the May 2013 hearing, reversal is not required where, as here, the correct findings were amply supported by the evidence.  (*In re A.J.* (2013) 214 Cal.App.4th 525, 538; *Janee W.*, *supra*, 140 Cal.App.4th at p. 1450; see also *People v. Geier* (2007) 41 Cal.4th 555, 582 [appellate court reviews the correctness of the court's ruling, not its reasoning, "and, if the ruling was correct on any ground, we affirm"].)

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.


*In re Jaden E.,* A139117

28

**TRIAL JUDGE:** Honorable Susan Etezadi

**TRIAL COURT:** San Mateo County Superior Court

**ATTORNEYS:**

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

John C. Beirs, County Counsel and Peter K. Finck, Deputy, for Plaintiff and Respondent.

*In re Jaden E.,* A139117

29